Filed 11/15/21 Shane v. Rumiano CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| KAREN LYNN SHANE, as Trustee, etc., | C087267 |
| Plaintiff and Appellant, | (Super. Ct. No. CI60054) |
| v. | |
| GARY RUMIANO et al., | |
| Defendants and Appellants. | |

This appeal involves a family dispute over a partnership known as Rumiano Farms. George Rumiano and his three sons, Gary, Keith, and Kraig Rumiano, were all once partners in Rumiano Farms.[1] After the four partners operated the partnership for over a decade, George sued his sons and the partnership for allegedly withholding distributions owed to him and attempting to remove him from the partnership. His sons,

---

[1] For clarity, we will refer to the parties by their first names going forward.

1

in turn, countersued, alleging that George voluntarily abandoned his partnership interest and his right to receive partnership distributions. They also, among other things, alleged that their parents, George and Kathleen Rumiano, titled certain real estate in their names that should instead have been titled in the partnership's name. Following George's death, his wife, Kathleen, and later one of his daughters, Karen Shane, pursued the case in his stead, with each acting in their capacity as trustee for George and Kathleen's trust.

After several phases of trial and over a decade of litigation, the trial court found in part in Karen's favor and in part in the brothers' favor. Favoring Karen, the court found that George never abandoned his partnership interest. It found that George and Kathleen's trust acquired George's economic interest in the partnership following his death. And it found that the three brothers owed George and his successors hundreds of thousands of dollars in partnership distributions. Favoring the brothers, the court found that the partnership owned the disputed properties that George and Kathleen had titled in their own names. And it found that Karen could not seek to dissolve the partnership and partition its property, because George and Kathleen's trust had only acquired George's economic interest, not his full interest, in the partnership.

All parties—Karen, as trustee for her parents' trust, the three brothers, and the partnership—appeal the trial court's decision. According to the brothers and the partnership, the brothers acquired George's partnership interest when he abandoned it before his death and, even if he never abandoned his interest, then they at least should have acquired it when he died. They also, among other things, allege that the court wrongly disqualified the partnership's counsel for having a conflict of interest, improperly prevented them from representing the partnership in the absence of counsel, and unlawfully appointed two referees to conduct an accounting. According to Karen, in turn, the court wrongly found that her parents' trust acquired only an economic interest in the partnership, improperly rejected her cause of action to partition the partnership

2

property, and wrongly concluded that the partnership, rather than her parents' successors, owned the disputed real estate.

We largely affirm. Unlike the trial court, however, we find that George and Kathleen's trust acquired George's full partnership interest, not merely his economic interest, in the partnership. We also find that the court improperly rejected Karen's partition cause of action at the summary adjudication stage. In all other respects, we affirm.

## BACKGROUND

### I

### *Factual Background*

George and his son Gary formed a partnership called Rumiano Farms in 1979. The partnership engaged in farming and conducted its business on three properties—a ranch in Vina, California (the Vina ranch) and a ranch and an office building in Willows, California (the Willows properties). In 1993, George's two other sons, Keith and Kraig, joined the partnership, and the four partners then entered into a partnership agreement.

For the next 13 years, it appears, the partners operated the partnership without controversy. But in late 2006, the partners' relationship began to deteriorate, though each of the parties offers a different gloss on the relevant events.

According to Kathleen's testimony, she and George decided to form a corporation for Rumiano Farms after consulting with an attorney in December 2006. But the brothers rejected the idea and later blocked George from using partnership funds to pay for the attorney's services. The brothers then, Kathleen stated, moved forward with a "plan[] . . . to kick George out" of the partnership. They first entered the Willows properties at night and "stole" partnership records from the office. They then, in January 2007, directed the partnership's accountant to remove George from the partnership.

George, Kathleen further stated, objected on learning of the brothers' actions and told Kraig, "You have kicked me out of the partnership." George, however, expressed an

3

openness to being bought out and "told Kraig to work some plan up that might be acceptable." After the brothers shared an offer, George and Kathleen drove to the Vina ranch and told the brothers that they could not accept the offered terms. The brothers, however, declined to take "no" for an answer. Kraig said, "This is going to be settled right now," and, when George and Kathleen attempted to leave in their car, he blocked their path with his truck. Kathleen managed to maneuver her car around Kraig's truck and find an open gate "to drive out, but someone drove across and blocked the gate." Eventually, after continuing to drive around the property, Kathleen found an unblocked exit and drove off. Both she and George, Kathleen said, were shaken by the experience.

The brothers, on the other hand, offered a largely different take on the facts. According to Gary, for example, the brothers "obtained the partnership records from the partnership office, but there is no evidence cited that they took the records 'in secret.'" And according to Gary and Keith, the brothers directed the partnership's accountant to remove George from the partnership, but they only did so on George's direction. In Gary's telling, George told the brothers in late 2006 that they "needed to take [him] out of the partnership" because Kathleen "ha[d] gone crazy." And in Keith's similar telling, George told the brothers that their "mother ha[d] gone crazy" and asked them to "take [him] out of this partnership." Based on this request, Keith said, the brothers told the partnership's accountant to "just zero out [George's] capital account."

A few months after the brothers attempted to remove George from the partnership, Kathleen sent her sons a certified letter accusing them of "try[ing] to strong arm" her and George into "giving [them] everything . . . before [they] died." She added that she and George initially planned to give the brothers most of their estate on the condition that they "always take care of [their two] sisters." But considering "[s]everal things," she wrote, she and George no longer believed that the brothers would care for their sisters. After the letter went returned unopened, George resent the letter with an added note,

4

saying, "You dumb shits. This letter was from me too. . . . You need to apologize for everything."

George and Kathleen afterward retained an attorney. In a letter to the brothers' attorney, George and Kathleen's attorney wrote: "Mr. and Mrs. Rumiano have contacted me because of a failure of communication with their three sons concerning the operation of Rumiano Farms, a partnership. They would like returned to them immediately all of their records." Their attorney added that George and Kathleen desired an accounting and an explanation concerning their not receiving payments for "their partnership interest." The brothers, it appears, never responded.

Shortly after their attorney delivered the letter, George and Kathleen amended their trust for the third and final time. George and Kathleen prepared their initial trust in 1992. Five years later, in their first amendment to their trust in 1997, George and Kathleen added a provision to account for the partnership. In the new provision, they directed "[t]he trustee [to] distribute . . . to Settlors' sons, GARY J. RUMIANO, KEITH D. RUMIANO and KRAIG J. RUMIANO, in equal undivided interests, all interest in RUMIANO FARMS. . . ." But in 2007, in their second amendment to their trust, George and Kathleen stated instead that "[a]ny and all interest in the general partnership, Rumiano Farms, shall be divided equally between Trustors' two daughters," Karen and Gale Raabe. George and Kathleen's third and final amendment to their trust in 2008 included similar language. It stated that Kathleen, if George predeceased her, would administer the "Trust Estate," including George's interest in the partnership, until her death. It then added that, on her death, Karen and Gale would administer the trust and ultimately inherit the "Trust Estate" in equal shares. Relevant here, the trust stated, "[t]he Trust Estate's one-fourth (1/4th) interest in RUMIANO FARMS, a partnership, shall be distributed, in equal shares, share and share alike, to KAREN LYNN SHANE and GALE GEORGENE RAABE."

5

## II

### *Procedural Background*

A. *The Parties' Suits*

In January 2008, George sued Gary, Keith, Kraig, and the partnership. He alleged that the brothers "refused to provide [him] with an accounting of the partnership business" and refused to "pay the amount due to [him]" as a partner. He sought an accounting, "a return of all business documents taken by [the brothers] from [him]," payment of all amounts due to him "and interest on that amount," and a declaration that he "is a partner in Rumiano Farms."

Gary, Keith, and Kraig afterward filed a cross-complaint in pro. per. on behalf of themselves and (purportedly) the partnership—though the trial court later found that the brothers, who were not attorneys, could not represent the partnership in court. The brothers alleged that, "due to age and health issues," George had earlier "advised [them] that he was withdrawing from [the] partnership and abandoning any interest in said partnership." They also alleged that George had used partnership assets to pay "personal and business expenses not a part of or associated with the partnership," including for the Willows properties, and that, as a result, the "partnership holds an unspecified interest in said properties." The brothers sought, among other things, a declaration clarifying the parties' respective interests in the partnership and an order quieting title to the Willows properties.

George died shortly after the brothers filed their cross-complaint. Kathleen, as the successor trustee to George and Kathleen's trust, replaced George as the plaintiff. Kathleen afterward filed an amended complaint that added a cause of action seeking to partition the partnership property.

B. *George's Successor in the Partnership*

The court handled the parties' competing claims in phases, starting in early 2010 with "the issue of whether," in light of George's death, "Kathleen Rumiano or the Trust

6

are a part of the partnership." Agreeing with Kathleen, the court found that George never withdrew from the partnership and, given his death, the brothers now needed to "conduct the partnership with the successor or transferee of George's estate"—namely, George and Kathleen's trust (or Kathleen, as trustee for the trust).

The court based its conclusion principally on paragraph XIX of the partnership agreement and George and Kathleen's trust, as initially drafted in 1992. Paragraph XIX, the court wrote, required the brothers, on George's death, to " 'continue to conduct a partnership under the terms of this agreement with any successor or transferee of GEORGE's estate.' " And, the court went on, "[a]t the time the agreement was made [in 1993], GEORGE already had a successor or transferee, specifically the Trust." The court thus concluded that "[t]he successor or transferee, as contemplated by paragraph XIX, is exactly whom one would expect it to be under the circumstances, specifically, KATHLEEN RUMIANO, as Trustee for 'The George Walter Rumiano and Kathleen Clara Rumiano Family Trust.' "

C. *Kathleen's Discovery & Keith & Kraig's Efforts to Disqualify All Judges*

Following the court's ruling, and after the brothers refused to allow her access to partnership records, Kathleen filed a motion to compel. The court granted the motion, ordering the brothers to "provide access to all books, records and information of defendant partnership RUMIANO FARMS." The court emphasized that "[a]ccess shall be total."

But because the brothers declined to comply with the court's order, the court later found them all in contempt of court. It placed the brothers on summary probation, ordered them to serve five days in jail, and suspended their sentence on the condition that they produce the ordered records. Over two months later, with the brothers still refusing to produce records, the court imposed the previously suspended sentence.

While Kathleen sought to obtain partnership records, Keith and Kraig sought to disqualify all trial court judges who touched the case and served at least six of these

7

judges with statements of disqualification. Keith and Kraig reasoned, it appears, that no judge could hear the case, because George "had unfairly sued his defendant partnership and partnership interest." The brothers, however, had little success in their efforts.

D.    *The Willows Properties & the Rights of George's Successor*

The court moved to the second phase of trial in early 2012, with the brothers still withholding access to partnership records. Before the start of trial, Kathleen and Gary separately filed motions asking the trial court to appoint a referee to conduct an accounting. Based on these requests, the court noted that "both parties, or all parties," are requesting an accounting and the appointment of a referee to conduct the accounting, though the court noted that it "d[id]n't want to speak for . . . Kraig and Keith." The court then proceeded to hear evidence concerning, among other things, the scope of the trust's interest in the partnership and the parties' competing claims to the Willows properties.

After hearing the parties' arguments and evidence, the court issued a ruling on three issues. First, the court granted the parties' "mutual request" for the "appointment of a referee to hear and determine an accounting." Second, the court quieted title for the Willows properties in the partnership. It reasoned that the properties, although titled in George's and Kathleen's names, "were purchased with financing that was completely paid by the partnership" and "have always been carried on the partnership books." Third, the court found that Kathleen, as trustee for the trust, had acquired only George's economic interest in the partnership and not his full partnership rights. Citing Corporations Code section 16502, the court reasoned that " '[t]he only transferable interest of a partner in the partnership is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions.' " In reaching this ruling, the court rejected the brothers' competing claim to George's partnership interest. The brothers argued that because George and Kathleen initially intended to gift George's interest to them, Kathleen's interest should be "held in constructive trust to be transferred to [them]." But the court disagreed. It found nothing in the partnership agreement

8

supported their position and, to the extent the brothers relied on promissory estoppel or detrimental reliance, the court found their position "not supported by the facts or credible evidence."

E.    *The Brothers' Motion for Summary Adjudication*

Following the court's ruling that Kathleen had acquired only George's economic interest in the partnership, the brothers moved for summary adjudication on her cause of action for partition of the partnership property. The court granted their motion. It reasoned that a person who holds only an economic interest in a partnership, as opposed to a full partnership interest, has limited authority to dissolve a partnership under the Corporations Code. It also found that the partnership agreement here allowed the partnership to be dissolved "only by agreement of [all] the partners."

F.    *The Appointment of the Referees & the Accounting Trial*

In June 2012, the court returned to the matter of the accounting. At a hearing, the court said it "want[ed] to confirm with all parties . . . that there was a consent of the parties to appoint a referee." Kathleen's counsel and Gary's counsel agreed on the record. Keith and Kraig, on the other hand, said nothing. But the court found "there is a consent of all of the parties to have a referee," and no one alleged any differently. The court later said "the reason for the appointment is simply for . . . a full accounting" that "is very broad and open" and, after the court asked the parties if there was "[a]nything else," all parties said there was not.

A couple of months later, Kathleen's counsel informed the court that the brothers were still withholding certain records. Gary's counsel and Keith, in response, countered that it was too late in the proceedings to seek additional records. In the words of Gary's counsel, "The[] [brothers] didn't produce the documents. They went to jail for that. . . . As far as I am concerned, that motion is behind us." The court, however, disagreed. It admonished the brothers that the order to produce records "hasn't gone away" and added that, should they continue to withhold records, "there may be consequences."

9

Over a year later, still lacking the records she sought, Kathleen moved for terminating sanctions. She died shortly after. George and Kathleen's two daughters and the successor cotrustees of the trust, Karen and Gale, afterward replaced Kathleen as the plaintiff—though Gale, it appears, eventually withdrew from the case. After the court indicated it would grant the motion if the brothers continued to withhold records, the brothers agreed to produce additional records. The court then, citing the brothers' recent "efforts to make the partnership records available," denied the motion.

Following the initial conference before the referees, the brothers objected to the scope of the referees' authority in the accounting proceedings. Keith and Kraig argued, for example, that the referees had limited authority to conduct an accounting because they never "agree[d] to an accounting by a referee." But the court rejected their objections. According to the court, the brothers agreed in June 2012 to an appointment of the referees to perform an accounting and they could not now claim, years later, that there was no agreement.

The referees held the accounting trial in 2017. To start, they found that the brothers never ultimately supplied all the records that Karen had sought, including the partnership's general ledgers for the years before 2007, and its 1980 and 1981 tax returns. The referees, however, declined to find that the brothers withheld these documents purposefully, stating only that, at the least, the brothers inadvertently lost or destroyed these records. Turning to the merits, the referees found that the brothers owed George and his successors $537,549 in partnership distributions after considering, among other things, the brothers' improper use of partnership money for their personal legal expenses and the brothers' failure to distribute partnership profits to George and his successors from 2007 to 2016. The referees also found that George and his successors were entitled to prejudgment interest on this amount. The court later adopted the referees' decision.

10

G.    *The Court's Judgment*

In 2018, the court issued its judgment. In the judgment, the court incorporated the referees' decision and the court's prior rulings concerning George's successor in the partnership, the Willows properties, and the brothers' motion for summary adjudication.

Keith and Kraig appealed. Gary and the partnership (collectively, Gary) appealed too. Karen cross-appealed.[2]

DISCUSSION

I

*George's Successor in the Partnership*

We consider first the parties' competing claims concerning the trust's interest, if any, in the partnership. Again, the trial court found that the trust acquired George's economic interest, though not his full interest, in the partnership following George's death. In particular, it found that the trust acquired George's right to receive partnership distributions and George's share of the partnership's profits and losses.

All parties, however, take issue with the court's conclusion. According to the brothers, they (not the trust) acquired George's partnership interest. Gary argues that the brothers acquired George's interest after he dissociated from the partnership, which either occurred when George expressed an interest in leaving the partnership or when he died. Gary alternatively argues, this time with support from Keith and Kraig, that the brothers

---

[2]    Karen asks us to judicially notice three documents from two earlier appeals and one writ proceeding in this matter. The first is the docket concerning Keith's 2011 appeal. Although unclear from the record, considering the timing of the appeal, the appeal appears to have concerned one of Keith and Kraig's unsuccessful attempts to disqualify a trial court judge. The second is the docket concerning Gary's 2016 petition for writ of mandate, which related to the referees' authority to preside over an accounting. And the third is the docket concerning Keith and Kraig's 2016 appeal, which also related to the referees' authority to preside over an accounting. We grant the request for judicial notice. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

11

should have acquired George's interest when he died because, at the time the partners' signed the partnership agreement, all parties understood that the brothers would eventually be named as George's successors. According to Karen, however, the trust acquired George's full partnership interest when he died according to the plain terms of the partnership agreement and the trust. We address each parties' argument in turn.

A. *George Did Not Dissociate from the Partnership*

We start with Gary's claim that George's interest transferred to the brothers following George's dissociation from the partnership. In his view, George dissociated from the partnership either in 2006 when he expressed an interest in withdrawing from the partnership or, at the latest, in 2008 when he died. That follows, he argues, from Corporations Code section 16601, which, relevant here, states: "A partner is dissociated from a partnership upon the occurrence of any of the following events:" "The partnership's having notice of the partner's express will to withdraw as a partner or on a later date specified by the partner," or, "[i]n the case of a partner who is an individual," "[t]he partner's death." (Corp. Code, § 16601, subds. (1), (7)(A).)

We find neither argument persuasive. We turn first to Gary's contention that George withdrew from the partnership in 2006. Several witnesses testified that, at some point before 2008, George expressed a willingness to withdraw from the partnership— though the underlying circumstances varied depending on the witness. According to Kathleen, again, after George accused his sons of "kick[ing] [him] out of the partnership" following their attempt to remove him as a partner, he asked Kraig "to work some plan up that might be acceptable." But the brothers never offered terms that he found acceptable. In Kathleen's telling, after she and George went to the Vina ranch to tell the brothers that they would not accept the one offer the brothers provided, Kraig said, "This is going to be settled right now," and then attempted to block their car from leaving with his truck. But Kathleen managed to maneuver their car around Kraig's truck and she and George eventually left the property. Both were "frightened" and "scared to death" by the

12

brothers' conduct, Kathleen testified, but they resolved not to be pressured to accept terms that they found inadequate.

The brothers, on the other hand, offered a very different view of the facts. According to Gary, in late 2006, George told the brothers that they "needed to take [him] out of the partnership" because Kathleen "ha[d] gone crazy." Around five months later, the brothers shared a proposed partnership buyout agreement with George and Kathleen, but they declined the offer. Keith testified similarly. George, Keith said, told the brothers that their "mother ha[d] gone crazy" and asked them to "take [him] out of this partnership." Gary, in response, later shared a proposed buyout agreement with George and Kathleen, but they rejected the proposal.

Following the parties' testimony and arguments, the trial court concluded "that George did not withdraw" from the partnership. Although the court accepted that George had indicated "some intention to withdraw," it was not an intent to " 'withdraw[] as of now.' " George's rejection of the proposed buyout agreement, the court added, "certainly suggests that he [wa]s not withdrawing from the partnership."

We find substantial evidence supports the court's conclusion. On this record, a reasonable trier of fact could have concluded that George neither shared an "express will" to withdraw "as of now," as the trial court put it, nor an "express will" to withdraw on a "later date specified." (Corp. Code, § 16601, subd. (1).) According to Kathleen's trial testimony, for example, George never agreed to leave the partnership. He instead only "told Kraig to work some plan up that might be acceptable" after the brothers attempted to force him out, but, in the end, he never accepted the one plan his sons proposed. George, in other words, expressed a willingness to withdraw from the partnership contingent on the terms of a buyout offer, but he then, after considering the one proposed offer, declined to withdraw. Considering this testimony, we find no error in the trial court's conclusion that George never shared an "express will" to withdraw.

13

Seeking a contrary finding, Gary counters that the trial court's conclusion rested on a misreading of Corporations Code section 16601. In his view, "the trial court erred in apparently equating a negotiated separation agreement with a notice of intent to withdraw. Instead, a determination of the buyout price is *the next step* after a partner has *expressed his will* to withdraw." But although we agree that these are often sequential events (first a dissociation, then an agreement on buyout terms; Corp. Code, §§ 16601, 16701), they are not always. A partner, for example, may agree to dissociate contingent on the details of a buyout agreement. And that, it appears, is what the trial court found here. It found that George, although open to having his interest bought out depending on the terms, neither expressed an intent to " 'withdraw[] as of now' " when he first spoke to his sons, nor expressed an intent to withdraw at the time that Gary shared the buyout proposal. Again, we find no error in that conclusion.

We turn next to Gary's contention that George withdrew from the partnership in 2008 on his death. His argument here is premised on Corporations Code section 16601, subdivision (1)(7), which, again, states that a partner dissociates from the partnership on his or her death. But that statute, like all statutes in the Uniform Partnership Act of 1994, governs only "[t]o the extent the partnership agreement does not otherwise provide." (Corp. Code, § 16103, subd. (a); but see *id.*, § 16103, subd. (b) [providing several exceptions irrelevant here].) And in this case, the partnership agreement plainly contemplates a different result.

Paragraph XIX of the agreement explains the effect of George's death. It states: "In the event of the death or permanent physical or mental disability of George, the partnership shall not dissolve or terminate but its business shall continue without interruption and without any break in continuity. On the death or disability of George, the other partners shall not liquidate or wind up in the affairs of the partnership, except as otherwise provided in this agreement, but shall continue to conduct a partnership under

14

the terms of this agreement with any successor or transferee of George's estate."
(Capitalization removed.)

As this language shows, the parties to the agreement did not contemplate that George's death would trigger the Uniform Partnership Act's default rules for a partner's death—which, if applicable, would have resulted in George dissociating from the partnership and the remaining partners purchasing his interest. (See Corp. Code, § 16701, subd. (a) ["If a partner is dissociated from a partnership, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price. . . ."].) The parties instead expressly contemplated that "any successor or transferee of George's estate" would take his place in the partnership upon his death and the partnership would then continue. Because this provision, and not the conflicting default rules in the Uniform Partnership Act, governs here, we reject Gary's claim premised on Corporations Code section 16601, subdivision (1)(7).

B. *The Trust Acquired George's Partnership Interest*

We turn next to the parties' remaining claims that they acquired, or at least should have acquired, George's partnership interest following his death. According to Karen, again, the trust acquired George's full partnership interest under the plain terms of the partnership agreement and the trust. But according to the brothers, they should have inherited George's partnership interest because, at the time of the partnership agreement, all parties understood that the brothers would eventually be named as George's successors. We conclude that Karen has the better argument.

As the trial court found, the partnership agreement is "reasonably clear" about the effect of George's death on his partnership interest—his interest would transfer to "any successor or transferee of George's estate." On this topic, again, the agreement states: "On the death or disability of George, the other partners shall . . . continue to conduct a partnership under the terms of this agreement with any successor or transferee of George's estate." As the trial court further found, the identity of the "successor or

15

transferee of George's estate" is also reasonably clear, though our reasoning is somewhat different than the trial court's own. According to George and Kathleen's final trust, Kathleen, as the surviving spouse, would administer the "Trust Estate" (including George's interest in the partnership) until her death, and then, on her death, Karen and Gale would administer the trust and ultimately inherit the "Trust Estate" in equal shares. Relevant here, the trust explained, "[t]he Trust Estate's one-fourth (1/4th) interest in Rumiano Farms, a partnership, shall be distributed, in equal shares, share and share alike, to Karen Lynn Karen and Gale Georgene Raabe." (Capitalization removed.) Considering the plain language of these documents, we find, like the trial court, that the brothers did not acquire George's partnership interest following his death. We find, instead, that the trust acquired George's partnership interest for the eventual benefit of Karen and Gale. (See Civ. Code, § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."].)

We further find, unlike the trial court, that the trust acquired George's full partnership interest, not merely his economic interest in the partnership. The trial court found differently based on Corporations Code section 16502, which states that "[t]he only transferable interest of a partner in the partnership is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions." But as discussed before, Corporations Code section 16502 (and the rest of the Uniform Partnership Act) governs only "[t]o the extent the partnership agreement does not otherwise provide." (Corp. Code, § 16103, subd. (a).) And in this case, the partnership agreement plainly contemplated that George's successor would acquire more than the mere right to receive profits and distributions. It contemplated that George's successor would take part in the "conduct[ing]" of the partnership—which only full partners, unlike transferees, may do. (See Corp. Code, § 16503, subd. (a)(2) [a transferee is not entitled, "during the continuance of the partnership, to participate in the management or conduct

16

of the partnership business, to require access to information concerning partnership transactions, or to inspect or copy the partnership books or records"].)[3]

In seeking a contrary ruling, the brothers ask us to stray from the partnership agreement's plain language. Although they acknowledge that the partnership agreement states that George's interest would transfer to "any successor or transferee of George's estate," and although they acknowledge that they are not the successors of George's estate under the trust, they assert that the partnership agreement is nonetheless ambiguous and that other considerations favor a finding in their favor. The brothers base their argument largely on the principle that "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) Because, they argue, George anticipated naming his sons as his eventual successors at the time he entered into the partnership agreement in 1993, which Kathleen herself even acknowledged, this initial intent should govern under Civil Code section 1636.

We find differently. Although true, as the brothers explain, that courts must construe a contract "to give effect to the mutual intention of the parties as it existed at the time of contracting" (Civ. Code, § 1636), "[s]uch intent is to be inferred, if possible, solely from the written provisions of the contract" (*Santisas v. Goodin* (1998) 17 Cal.4th

---

[3]    Karen also argues that the court's ruling on this point should be reversed because it "directly contradicted two earlier court rulings on the same issue made by two different Superior Court judges." (See *In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, 1248 ["Generally, one trial court judge may not reconsider and overrule an interim ruling of another trial judge."].) As she notes, after the first phase of the trial, one judge found that the trust, as George's successor, "retains the partnership interest of GEORGE RUMIANO in the partnership." And as she further notes, another judge later granted Kathleen, as trustee, full access to the partnership's records—which, Karen argues, showed the judge believed that the trust was a full partner. But because we agree that the court improperly found that George's successor acquired only George's economic interest in the partnership, we need not consider this alternative ground for reversal.

599, 608; see also Civ. Code, §§ 1638, 1639). And this intent is to be determined " 'by an external, not by an internal standard—or by what has been termed the objective rather than the subjective test.' " (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 352.) Applying these principles here, we find that the plain language of the parties' agreement evinces, more than anything else, George's intent to retain discretion in selecting his successor. The parties' agreement, after all, did not name any particular person as George's successor, which, had the parties desired, could have been easily accomplished. The agreement instead broadly referred to "*any* successor or transferee of George's estate," employing a modifier, "any," that " 'has an expansive meaning' " (*Ali v. Federal Bureau of Prisons* (2008) 552 U.S. 214, 219), and referring to a person, the "successor or transferee of George's estate," who the partners likely understood would be uncertain until the time of George's death (see Prob. Code, § 15400 ["Unless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor."], see also *id.*, § 6120, ["A will or any part thereof is revoked by any of the following: [¶] (a) A subsequent will which revokes the prior will or part expressly or by inconsistency. [¶] (b) Being burned, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revoking it, by either (1) the testator or (2) another person in the testator's presence and by the testator's direction."]).

Moving to the terms of the rest of the partnership agreement, the brothers next contend that they too show "that the sons were the intended successors or transferees." But we find none of the provisions they cite support their desired reading of the partnership agreement.

Starting with paragraphs V and XIV, Gary claims these provisions show that each partner must be capable of running an agricultural operation (paragraph V) and must "devote full time and attention to the partnership business" (paragraph XIV). But even if that were true, that does not advance his position. The brothers, after all, are surely not

18

the only people capable of running an agricultural operation. Nor are they the only people capable of devoting full time and attention to the partnership business.

Turning next to paragraph XVI, the brothers note that, under this provision, no partner can transfer his interest in the partnership to another "without the written consent of the other partners," unless the transferee is also a partner. Given this language, they argue, George could not transfer his interests to his preferred successor without the other partners' written consent. But their argument overlooks the parties' written consent in paragraph XIX to work with George's chosen successor. In paragraph XIX, again, the partners agreed that, on George's death, the remaining partners would "continue to conduct a partnership under the terms of this agreement with *any* successor or transferee of George's estate." (Italics added.)

Focusing next on paragraphs XVIII, XX, and XXI, Gary finds it significant that George and the other partners were treated differently in terms of withdrawal and death. These provisions, we agree, treat George and the brothers differently. Paragraphs XX and XVIII deal with partner withdrawals. Paragraph XX authorizes Gary, Keith, and Kraig to withdraw from the partnership after a certain amount of time and entitles each, on withdrawing, to request to be bought out. Paragraph XVIII, taking a different approach, authorizes George to withdraw from the partnership in any year and mentions no comparable right to be bought out. Paragraphs XIX and XXI, in turn, deal with the death of a partner. Paragraph XIX, again, discusses the effect of the death of George and states that his interest will transfer to any "successor or transferee" of his estate. Paragraph XXI, in contrast, discusses the effect of the death of Gary, Keith, and Kraig and states that "the other partners, not including GEORGE, . . . shall purchase the interest of the deceased partner." Given this structure of the partnership agreement, Gary argues that "George's share was to be transferred to his sons on his death or disability, and without payment of compensation."

In our view, however, Gary's offered provisions tend to support Karen's position, not his own. As these provisions show, the partners were reasonably clear when the brothers were to acquire a deceased partner's interest. Paragraph XXI, for example, explains that, if one of the brothers dies, the remaining two brothers would "purchase the interest of the deceased partner." But the parties took a different approach in paragraph XIX. Unlike in paragraph XXI, paragraph XIX does not state that, in the event of George's death, the brothers would acquire or "purchase the interest of the deceased partner." It instead is clear that the "successor or transferee of George's estate" would acquire George's interest. We find the parties' distinct choice of language in these two paragraphs is significant, for had the parties intended to identify the brothers as George's successors, it is clear they knew how to do so. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1135 [finding that the parties to an agreement had not intended the term "[p]urchaser" to include the buyer's subsidiaries, as the agreement showed that "[w]hen the parties intended to identify 'subsidiaries,' they knew how to do so"].)

Lastly, in terms of the agreement's provisions, Gary contends paragraphs XXIII and XXXII support the brothers' position. Paragraph XXIII requires Gary, Keith, and Kraig, but not George, to purchase and maintain "insurance upon the life of each other through the partnership." But because Gary never explains why this provision advances his position, and because we do not find the relevance of the provision self-evident, we find his argument forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].) Paragraph XXXII, in turn, states that no third parties are "entitled to enforce or make any claims, or have any right pursuant to the provisions of this agreement." But again, Gary declines to explain why this provision advances his position. Perhaps he intends to characterize Karen as a third party who lacks any right under the partnership agreement. But to the extent that is

20

his intended point, we reject it. Karen is not a mere third party. She is instead the trustee of the trust that acquired George's partnership interest.

Next, moving beyond the agreement's terms, Gary contends the brothers "had no objection to George's lack of active participation in the partnership business over the 10 or more years preceding his death" (i.e., since around 1998), "because of the intent and express understanding between the partners that his sons were succeeding to George's interest." Gary, in other words, appears to argue that no matter the terms of the agreement, the brothers should nonetheless receive George's partnership interest under the doctrine of promissory estoppel. (See *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 ["under the doctrine of promissory estoppel, '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise' "].) But because Gary cites nothing in the record showing that he and his brothers actually refrained from objecting to George's alleged "lack of active participation" for this reason, we cannot accept this unsubstantiated claim. (See *ibid.* [to trigger promissory estoppel, the promise must actually induce "action or forbearance"]; see also *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364 ["if it is not in the record, it did not happen"].)

Gary also argues that, should we find that the trust acquired George's partnership interest, then our decision would conflict with the court's decision in *Presta v. Tepper* (2009) 179 Cal.App.4th 909. We disagree. The partnership agreement in *Presta* named two partners—both of whom were acting in their capacity as trustee for a family trust— and "required that upon the death of a 'partner,' the partnership shall purchase his interest in the partnership." The court considered whose death mattered for purposes of this provision—"the death of one of the two men" or the "death" of one of the two trusts? "The answer," the court held, "[wa]s 'the men.' " (*Id.* at p. 911.) "Because," the court

concluded, "the trusts created by [the men] constituted mere relationships under California law, rather than the sort of entities which might be capable of fulfilling the role of 'partner' in a partnership, we have no trouble concluding that the 'partners' for purposes of each agreement at issue herein had to be [the men] themselves." (*Id.* at p. 917; but see *Han v. Hallberg* (2019) 35 Cal.App.5th 621, 624-625 [rejecting *Presta*], review granted Aug. 21, 2019, S256659, review dism. Aug. 31, 2019.) According to Gary, "[a]pplying *Presta* results in George being dissociated by his death, since his Trust could not be a partner." We find differently. Should, as the *Presta* court found, a trust be unable to serve as a partner, the fix in this case would be a simple change of label. Rather than say, for example, that the trust is a partner in the period before George and Kathleen's estate is distributed, we would say instead that Karen, the trustee for the trust, is a partner in this period.

Finally, Gary claims the trial court failed to consider the brothers' extrinsic evidence when evaluating their constructive trust claim. Without a single citation to the record, he claims that the court "ignored the [parties'] testimony on the basis it was not credible, refused to consider the Trust instrument as it related to the intent of the parties, and simply interpreted the partnership agreement." Because, however, Gary offers no record evidence supporting his claim, we treat the argument as forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; *Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1406 [courts "may disregard any claims when no reference [to the record] is furnished"].)

II

*The Brothers' Remaining Contentions*

A. *The Brothers' Ability to Represent the Partnership*

We turn next to the brothers' remaining arguments, starting with Keith and Kraig's contention that the court wrongly found that they could not represent the

22

partnership in court. After the brothers purported to speak on the partnership's behalf in the initial stages of the trial, the court found "[t]hey do not and cannot" represent the partnership in court. It reasoned that "a partnership as an entity, much like a corporation, must be represented by counsel." According to Keith and Kraig, the court was wrong; "there is no law against partners representing their partnership."

We find differently. Our conclusion readily follows from our Supreme Court's decision in *Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724 (*Merco*). The court there—considering a statute authorizing a corporation to appear in court through " 'a director, an officer, or an employee, whether or not such person is an attorney' "—reaffirmed its long-standing conclusion that " '[a] corporation cannot represent itself in court, either in propria persona or through an officer or agent who is not an attorney.' [Citation.]" (*Id.* at pp. 727, fn. 2, 729.) The court reasoned as follows. Because a corporation is distinct from its stockholders, officers, and employees, none of these individuals can appear in court as the corporation itself; they can only appear in court as the agent of the corporation. But because a person purporting to represent another in court is engaged in the practice of law, that person must be an attorney. (*Id.* at pp. 729-730.) Putting it all together, the court "conclude[d] the Legislature cannot constitutionally vest in a person not licensed to practice law the right to appear in a court of record in behalf of another person, including a corporate entity." (*Id.* at p. 727.)

We find this same logic supports the trial court's conclusion here. As the Corporations Code makes explicit, "[a] partnership is an entity distinct from its partners." (Corp. Code, § 16201.) And because it is distinct, a la *Merco*, partners cannot speak as the partnership itself in court. They can instead only appear in court as the agent of the partnership. But again, because a person purporting to represent another in court is engaged in the practice of law, that person can only do so if he or she is an attorney. (*Merco*, *supra*, 21 Cal.3d at pp. 729-730; see also *Clean Air Transport Systems v. San*

23

*Mateo County Transit Dist.* (1988) 198 Cal.App.3d 576, 579 [unincorporated associations, like corporations, must be represented by counsel in court].)

B. *The Court's Disqualification of the Partnership's Counsel*

Gary, relatedly, contends the court wrongly disqualified the partnership's counsel for having a conflict of interest.

Six years after the court ruled that the brothers could not represent the partnership in court, the partnership retained Mark D. Norcross as its counsel and filed an answer to George's complaint. Karen, however, objected to Norcross representing the partnership, contending he had a conflict of interest. The trial court agreed. It found that Norcross had a conflict of interest because he already had an attorney-client relationship with one of the partners, namely, Gary. It also found that Norcross "d[id] not have any type of waiver of conflict at this point." For these reasons, the court concluded that "at this point Mr. Norcross would be disqualified."

Gary, however, alleges that the court never should have considered this issue. Because, he argues, the trust did not acquire George's full partnership interest, it neither had standing to allege a conflict of interest nor could show a conflict of interest.

But because we reject the premise of Gary's argument, for the reasons discussed in part I.B. of the Discussion above, we also reject this argument.

C. *The Appointment of the Referees*

The brothers next challenge the appointment of the referees. They argue that the trial court wrongly appointed the referees under Code of Civil Procedure section 638 (section 638), which involves consensual appointments of referees. In their view, the court should have instead appointed the referees under Code of Civil Procedure section 639 (section 639), which involves nonconsensual appointments of referees. We reject their argument.

Section 638, as relevant here, provides: "A referee may be appointed upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes, or upon

24

the motion of a party to a written contract or lease that provides that any controversy arising therefrom shall be heard by a referee if the court finds a reference agreement exists between the parties: [¶] (a) To hear and determine any or all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision," or "(b) To ascertain a fact necessary to enable the court to determine an action or proceeding." Section 639, in turn, as relevant here, provides: "(a) When the parties do not consent, the court may, upon the written motion of any party, or of its own motion, appoint a referee in the following cases pursuant to the provisions of subdivision (b) of Section 640: [¶] (1) When the trial of an issue of fact requires the examination of a long account on either side; in which case the referees may be directed to hear and decide the whole issue, or report upon any specific question of fact involved therein."

Section 638, thus, deals with consensual appointments of referees, and section 639 deals with nonconsensual appointments. The distinction between the two can be significant. "In the case of a consensual general reference pursuant to Section 638," for example, "the decision of the referee or commissioner upon the whole issue must stand as the decision of the court, and upon filing of the statement of decision with the clerk of the court, judgment may be entered thereon in the same manner as if the action had been tried by the court." (Code Civ. Proc., § 644, subd. (a); see also *Jovine v. FHP, Inc.* (1998) 64 Cal.App.4th 1506, 1522 ["[a] 'general' reference is conducted pursuant to section 638, subdivision (1)," now subd. (a)].) But "[i]n the case of all other references," including references under section 639, "the decision of the referee or commissioner is only advisory. The court may adopt the referee's recommendations, in whole or in part, after independently considering the referee's findings and any objections and responses thereto filed with the court." (Code Civ. Proc., § 644, subd. (b).)

In our case, the parties appear to agree that the court's minutes evidence an agreement to appoint a referee. Gary, for example, concedes that "the minutes establish[] that both sides agreed that an accounting could be performed via a referral"—though

25

neither he nor his brothers appear to supply the relevant minutes, leaving us with an incomplete record. But according to the three brothers, the minutes nonetheless did not suffice to establish a section 638 appointment for two reasons: First, the minutes omitted "any indication of the section under which th[e] referral was made," and second, "the trial transcripts reveal that neither Kraig's nor Keith's agreement was sought or obtained." We find neither argument persuasive.

Starting with the substance of the court's minutes, we reject the brothers' contention that the minutes omitted "any indication of the section under which th[e] referral was made." Perhaps the court's minutes referenced section 638. Or perhaps, as the brothers allege, they did not. But because the brothers failed to supply the minutes, we cannot resolve this issue in their favor. (See *Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 935, fn. 3 [" 'To the extent the record is incomplete, we construe it against [the appellants].' "].) Even supposing the court's minutes did not explicitly reference section 638, moreover, that still would not advance their position. Nothing in section 638, after all, required the court's minutes to reference section 638. It only required, as relevant here, an "agreement of the parties . . . entered in the minutes." Considering this language, our Supreme Court has found sufficient for purposes of section 638 language in the minutes stating, " 'Referred to J.W. Mullin, Jr.,' " when other circumstances indicated "a prior consent to the reference or a waiver of objection thereto." (*Estate of Hart* (1938) 11 Cal.2d 89, 91-92 (*Estate of Hart*).) We see no reason to demand more here.

Turning next to the evidence in the record, we find substantial evidence supports the trial court's conclusion that all parties agreed to the appointment of the referees. Before trial, both Gary and Kathleen sought a referral under section 639. Kathleen asked the court to appoint a referee to (1) "[c]arry[] into effect the Order of Dissolution of the partnership by sale of the partnership assets" and (2) "tak[e] . . . an account for information to the Court before Judgment as to the capital positions of the partners and an

26

accounting of the partnership assets as between the partners." Gary, in turn, asked the court to appoint a referee to (1) perform "a financial accounting of the Partnership expenses" and (2) "assess the validity [of] Defendant Gary Rumiano's claims that Plaintiff misapplied partnership funds and to determine damages."

The court later, at a January 2012 hearing, briefly discussed the parties' filings. It mentioned that "both parties, or all parties," are requesting an accounting and the appointment of a referee, though the court noted that it "d[id]n't want to speak for . . . Kraig and Keith." A few months later, in May 2012, the court issued a ruling on this and other topics. It stated, as relevant here: "All parties in this case have requested an appointment of a referee to hear and determine an accounting. The court GRANTS this mutual request. The parties shall meet and confer to select a referee."

A month afterward, in June 2012, the court held a hearing on the appointment of a referee. At the start of the hearing, the court said it "want[ed] to confirm with all parties . . . that there was a consent of the parties to appoint a referee." Kathleen's counsel and Gary's counsel agreed on the record. Keith and Kraig, on the other hand, said nothing. But the court found "there is a consent of all of the parties to have a referee," and no one alleged any differently.

The court afterward, pursuing the matter further, asked whether "this should be handled as a [section] 638 consent of the parties' referee" or under section "639, the nonconsensual appointment of a referee." Kathleen's counsel, although agreeing that Kathleen consented to the appointment of a referee, noted his "original intent. . . was a [section] 639" appointment because of "the contentious nature of the problems relating to this case." Gary's counsel, in turn, also indicated that his original intent was more limited. Although agreeing that Gary consented to the appointment of a referee, he noted that he "asked for a referee for a specific purpose, and that was to determine what we contended were inappropriate expenditures by George and Kathleen." But after the court questioned this claim, Gary's counsel backtracked somewhat. He acknowledged that he

27

initially "wanted the referee to hear and determine an accounting," but, because the court later found that Kathleen held only "an economic interest" in the partnership, he now "question[ed] why we need to do a full accounting." After further discussion, however, he (along with Kathleen's counsel) agreed to an accounting that would determine "the capital positions of the partners."

The court then, after finding that all parties "agreed in this case . . . for an accounting," discussed potential options for a referee with the parties. Following a short recess, the parties agreed on two referees. The court then stated: "[T]he reason for the appointment is simply for an accounting, a full accounting pursuant to the Partnership Act. I think that is very broad and open, as opposed to trying to limit them." Gary's counsel responded, "Okay." Shortly after, the court asked the parties if there was "[a]nything else." All parties, including Keith and Kraig, said there was not.

On this record, we find substantial evidence supports the trial court's conclusion that the two referees were appointed "upon the agreement of the parties . . . entered in the minutes." (§ 638.) According to Gary, again, the minutes for the June 2012 hearing "establish[] that both sides agreed that an accounting could be performed via a referral." The trial court found likewise, stating at a 2016 hearing that it "went to check the minutes from June 28th [2012] and the stipulation certainly was there. The stipulation has been reached, Larry Moss and George Lewellen to be appointed as referee." Our reading of the record—including the court's statement in open court, without any objection from the parties, that "there is a consent of all of the parties to have a referee"—adequately supports this conclusion, even though the parties never explicitly agreed that the referees would be appointed under section 638. (See *Estate of Hart*, *supra*, 11 Cal.2d at p. 92 [finding parties' conduct "[wa]s indicative either of a prior consent to the [§ 638] reference or a waiver of objection thereto," even though nothing in the record showed that the parties expressly agreed to the reference].)

28

All that said, we acknowledge that the record here is not perfect. As the brothers note, for example, neither Keith nor Kraig consented to the referral on the record. But even so, we find the record sufficiently reflects their consent. The court, again, expressly stated in a written ruling that "[a]ll parties in this case have requested an appointment of a referee to hear and determine an accounting." No one objected to that ruling. A month later, the court asked the parties "to confirm . . . that there was a consent of the parties to appoint a referee." After hearing from Gary and Kathleen and surveying the courtroom, the court found "there is a consent of all of the parties to have a referee." No one objected to that finding either. A little later, after the parties agreed to two referees and the court said, "the reason for the appointment is simply for . . . a full accounting," the court asked if there was "[a]nything else." All parties, including Keith and Kraig, said there was not. We find this record enough to conclude that Keith and Kraig consented to the appointment, even if they did not affirmatively state their consent on the record. (See *In re Horton* (1991) 54 Cal.3d 82, 91 [California "cases hold that conduct short of an express oral or written stipulation may be tantamount to a stipulation that a court commissioner may sit as a temporary judge"]; *Estate of Hart*, *supra*, 11 Cal.2d at p. 92; cf. *People v. Toro* (1989) 47 Cal.3d 966, 977-978 [the defendant's failure to object to proposed jury instructions, after being "asked to state any objection," "constituted an implied consent"], disapproved of on other grounds by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)

Raising a further shortcoming, the brothers note that the court's orders appointing the referees referenced section 639, not section 638—which led the referees to believe, at least initially, that their appointment was under section 639. This, we agree, is notable. Both orders used a preprinted Judicial Council form that had separate provisions depending on whether the referee appointment was under section 638 or section 639, and, for each order, the box for a section 639 appointment was checked. But as the trial court pointed out, these orders were prepared years after the parties' agreement in June 2012.

29

The trial court, with that mind, ultimately found that the orders included a mistake that likely only occurred because the orders, which were prepared in May 2014, memorialized an agreement that occurred two years earlier in June 2012. A wrongly checked box in a tardy order, the court found, could not undo the parties' earlier agreement to appoint the referees. We find that reasoning sound. (See *Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1339, 1342-1344 ["labels are not controlling"; although the parties agreed in writing to a "reference" under "Code of Civil Procedure section 638," other considerations showed the parties instead agreed to binding participation].)

Apart from the issues discussed above, the brothers separately allege several additional shortcomings in the court's appointment—none of which we find persuasive. Gary alleges the parties' conduct—and in particular, their filing of "[s]ubstantive legal motions [with the court], including a motion for summary adjudication" on Karen's partition cause of action, motions relating to the pleadings, and a " 'motion' to disqualify counsel"—shows that the parties never intended the referees to resolve "all issues." But none of this conduct was inconsistent with the trial court's conclusion. The court, after all, never found that the parties had stipulated to have the referees resolve "all issues." It found instead that the parties had stipulated to have the referees conduct an accounting, and Gary has not shown that the parties' filing of "[s]ubstantive legal motions" with the court on nonaccounting topics conflicted with that finding.

Keith and Kraig, in turn, argue that a trial court may appoint a referee under section 638 only if the parties have consented to the appointment in writing. Several cases, we acknowledge, can be construed to support that point. In *Murphy v. Padilla* (1996) 42 Cal.App.4th 707, for example, the court offered this take on section 638: "The courts have made it clear that a trial court may not order a general reference by agreement of the parties pursuant to this section absent written consent." (*Id.* at p. 714.)

In our view, however, that is a bit of an overstatement. A trial court may appoint a referee under section 638 in four specified circumstances: (1) "upon the agreement of the

30

parties filed with the clerk," (2) "upon the agreement of the parties filed with the . . . judge," (3) "upon the agreement of the parties . . . entered in the minutes," or (4) "upon the motion of a party to a written contract or lease that provides that any controversy arising therefrom shall be heard by a referee." Most of these scenarios involve some type of written consent. But the third does not—it requires only an agreement "entered in the minutes." Construing this language, our Supreme Court, as discussed earlier, found sufficient for purposes of section 638 language in the minutes stating, " 'Referred to J.W. Mullin, Jr.,' " when other circumstances indicated "a prior consent to the reference or a waiver of objection thereto." (*Estate of Hart*, *supra*, 11 Cal.2d at pp. 91-92; see also *Jovine v. FHP, Inc.*, *supra*, 64 Cal.App.4th at p. 1527 ["an agreement made in open court which is *entered* in the minutes or docket of the court" satisfies § 638]; *In re Horton*, *supra*, 54 Cal.3d at p. 91.) Again, we see no reason to demand more here.

Keith and Kraig also contend the court's "order[ing] the referees to act as discovery referees and order[ing] the parties to pay the referees," in the absence of agreements on those topics, "confirms the C.C.P. §639 status of the referral." We disagree. At most, their argument tends to show that the court exceeded the scope of the parties' agreement in directing the parties to pay the referees and in allowing the referees to conduct discovery (which we will turn to next)—not that the parties lacked an agreement altogether concerning the appointment of the referees.

Related to the above, Keith and Kraig suggest that the court exceeded the scope of the parties' agreement in allowing the referees to conduct discovery. In particular, they argue, "the Court issued an order for the referees to conduct discovery proceedings . . ., which obviously without an agreement of the parties would also be under authority of C.C.P. §639, as there never has been consent for the referees to perform new discovery." But Keith and Kraig have not shown that the referees even conducted discovery, and so, even if the court went too far in allowing the referees to oversee discovery proceedings, we cannot say the brothers suffered prejudice as a result. (*Christ v. Schwartz* (2016)

31

2 Cal.App.5th 440, 455 [before an error may warrant reversal, "appellant has the burden of affirmatively demonstrating prejudice"].)

Lastly, Keith and Kraig contend the court's appointment of the referees was invalid because it failed to comply with various California Rules of Court. Specifically, they allege, "[t]he Court does not have the . . . documentation . . . mandatory under California Rules of Court," rule 3.901 (which requires "[a] written stipulation or motion for an order appointing a referee under Code of Civil Procedure section 638) [to] be presented to the [court]"), rule 3.904 (which requires referees to submit a certain certification before serving), and rules 2.810 through 2.819 (which describe various requirements for temporary judges).

We reject their argument. Even supposing the trial court lacked the "documentation" required under these rules, we would not find reversible error for that reason alone. As our Supreme Court explained in a similar context in *In re Richard S.* (1991) 54 Cal.3d 857, a rule "may impose on the state a duty to act in a particular way, and yet failure to do so may not void the governmental action taken in violation of the duty." (*Id.* at p. 865.) That is particularly true of rules " 'designed to serve some collateral, administrative purpose,' " as distinct from rules " 'intended to provide protection or benefit to . . . individuals.' " (*People v. Gray* (2014) 58 Cal.4th 901, 909.) In this case, we find that Keith and Kraig, in focusing on the court's alleged failure to have certain "documentation," have only alleged a failure to comply with rules " 'designed to serve some collateral, administrative purpose.' " And those types of rules, our Supreme Court has made clear, are "merely directory, and failure to comply with [them] does not invalidate later [court] action." (*Ibid.*; see also *In re Richard S.* at p. 865 [temporary judge's presiding over a matter, before the filing of the trial court's order appointing the temporary judge, was not reversible error].)

In the end, none of the brothers have met their burden to show that the trial court erred in its appointment of the referees. To use the words of our Supreme Court, the trial

32

court's conclusion that the parties agreed to an appointment under section 638, "though not conclusive on a direct attack by appeal, is presumed to be correct. In the absence of a strong showing to controvert it, and there is no affirmative evidence in the record [cited] which does so, it must be accepted as true." (*Estate of Hart*, *supra*, 11 Cal.2d at p. 92.)[4]

D. *Award of Prejudgment Interest*

Gary, for two reasons, asserts that the referees and the trial court erred in awarding prejudgment interest. We disagree.

The referees, again, found that the brothers owed George and his successors $537,549 in distributions. They calculated this amount after considering, among other things, the brothers' improper use of partnership money for their personal legal expenses and the brothers' failure to distribute partnership profits to George and his successors from 2007 to 2016. The referees further found that George and his successors were entitled to prejudgment interest on the amount owed under Civil Code section 3287, which, relevant here, states: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day. . . ." (Civ. Code, § 3287, subd. (a).) The referees reasoned that the amount of the damages owed were sufficiently "certain" within the meaning of Civil Code section 3287, because "[t]he Rumiano brothers had sufficient information to determine" their own entitlement to distributions since 2007, and so, it follows, they also had sufficient information to "easily" determine George's and his successors' entitlement to distributions. The trial court later adopted this conclusion.

---

[4] A further issue to consider, perhaps, is whether the court appointed the referees under section 638, subdivision (a)—which allows referees to resolve factual and legal issues—or section 638, subdivision (b)—which allows referees to resolve factual issues only. But because none of the brothers raise this issue, we need not consider it.

Attempting to set aside this award of prejudgment interest, Gary first contends the award of interest was procedurally improper because it was untimely. Because, Gary argues, Karen "did not request prejudgment interest at any point in the accounting proceeding, never briefed or argued the issue, and never presented a motion according Gary his due process rights," the referees should not have awarded her any prejudgment interest. That follows, he claims, from *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824 (*North Oakland*).

But as other courts have stated under similar circumstances, "[t]he present case bears no resemblance to the extreme facts in *North Oakland*." (*Steiny & Co. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 294.) In *North Oakland*, the prevailing party attempted to insert prejudgment interest into a cost award after the entry of judgment and after the time for filing a motion for new trial had expired. (*North Oakland,* 65 Cal.App.4th at pp. 827, 830.) But the trial court declined to award prejudgment interest and the Court of Appeal later affirmed. (*Id.* at p. 828.) The Court of Appeal reasoned that the request for prejudgment interest was procedurally improper in two respects: One, the plaintiff could not seek prejudgment interest as a cost, because "prejudgment interest is not a cost"; and two, the plaintiff sought prejudgment interest too late in the proceedings. (*Id.* at pp. 830-831.)

Our facts, however, are quite different and resemble more the facts in *Segura v. McBride* (1992) 5 Cal.App.4th 1028. In *Segura*, the plaintiff sought in his complaint damages and " 'such other and further relief as the Court deems just and proper,' " and the trial court, after finding in the plaintiff's favor, awarded the plaintiff damages and prejudgment interest. (*Id.* at pp. 1041, 1034.) On appeal, the defendant alleged that the plaintiff waived his right to prejudgment interest because he failed to "specifically request prejudgment interest at trial." (*Id.* at p. 1041.) But the court disagreed, concluding that the plaintiff's "prayer [wa]s sufficient for the court, on its own, to invoke its power to levy such prejudgment interest as it deem[ed] just and equitable." (*Ibid.*)

34

We find likewise here. Following the *Segura* court's reasoning, which the *North Oakland* court itself cited with approval (*North Oakland*, *supra*, 65 Cal.App.4th at p. 829), we find that Karen's explicit prayer for interest in her complaint was sufficient for the referees, on their own, "to levy such prejudgment interest as [they] deem[ed] just and equitable."

Gary next contends the award of interest was improper considering the text of Civil Code section 3287. That statute, again, authorizes "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, . . . also to recover interest thereon from that day. . . ." (Civ. Code, § 3287, subd. (a).) According to Gary, because "the final sum determined by the referees was not certain until the referees' decision," Karen is not entitled to prejudgment interest on that sum.

But Gary never shows, as he alleges, that the damages owed here were uncertain. He asserts that "California courts have consistently held that, as here, 'where an accounting is required in order to arrive at a sum justly due, [prejudgment] interest is not allowed.'" But although we acknowledge that some courts have used that language (see *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907), they have done so on the premise that, in many accounting actions, "'damages cannot be computed except on conflicting evidence . . . because of the absence of established or reasonably ascertainable market prices or values'" (*id.* at p. 908).

Gary, however, has not shown that to be the case here. In his effort to show uncertainty, he argues that "the $537,549 awarded to Plaintiff on its partnership accounting claim was the subject of vastly conflicting evidence at trial, including both written accountings and expert accountant testimony, Mr. Michael Massey for Plaintiff and Ms. Julie Shea for Defendants, neither of whose calculations the Referees accepted in arriving at the award." But because Gary cites nothing in the record showing this "vastly conflicting evidence," we decline to consider this unsubstantiated argument. (Cal. Rules

35

of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; *Jumaane v. City of Los Angeles*, *supra*, 241 Cal.App.4th at p. 1406 [courts "may disregard any claims when no reference [to the record] is furnished"].)

Gary also contends the large discrepancy between the amount of damages awarded and the amount of damages sought further reflects uncertainty in the amount of damages. Courts at times, we acknowledge, have found this type of detail notable. (See *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.*, *supra*, 149 Cal.App.3d at p. 910 [finding that a large discrepancy between the amount prayed for in the plaintiff's complaint and the amount later awarded the plaintiff supported the conclusion that the sum due was not certain until judgment].) But courts have found differently when the defendant, and not the plaintiff, "possessed the relevant records" for determining damages, and the plaintiff had "merely" sought to "safeguard[] its interests by praying for a large recovery." (*National Farm Workers Service Center, Inc. v. M. Caratan, Inc.* (1983) 146 Cal.App.3d 796, 811.) Because it is this latter scenario that most reflects our facts, we reject Gary's claim here too.

Finally, Gary argues that "[t]he referees' selection of certain amounts within the 'Accounting' as somehow deserving interest while simultaneously ignoring the account as a whole, the offsets, and the clear majority of claims asserted by both Plaintiff and Defendants within the accounting (i.e., those claims not awarded) is inequitable and contrary to the real circumstances of the case and legal precedent." But Gary never describes "the offsets" that the referees supposedly ignored, and, in any event, "[d]amages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by the defendant." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 536.) And although we acknowledge that the referees rejected some of Karen's claims that arguably involved uncertain damages (including one, which Gary focuses on, concerning the value of George's initial contribution to the partnership

36

in 1980), that does not mean that all of Karen's claims for damages were rendered uncertain as a result.

Gary's contrary position appears to rest on the premise that had Karen succeeded on the claims that the referees rejected, and had the referees found some of those other claims involved uncertain sums, then the referees would have needed to find that all Karen's claims involved uncertain sums. We find differently. Under those circumstances, the referees still could have found that some of her claims warranted an award of prejudgment interest even if certain other claims did not, as the court found in *Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054. (*Id.* at pp. 1061-1063 [although the damages the plaintiffs sought under one of their claims were too uncertain to support an award of prejudgment interest, the damages they sought under another of their claims "satisfie[d] the requirements of subdivision (a) of Civil Code section 3287"]; see also *Ferrellgas, Inc. v. American Premier Underwriters, Inc.* (C.D.Cal. 1999) 79 F.Supp.2d 1160, 1163 ["Claims or judgments may consist of severable parts for the purposes of computing prejudgment interest."].) A defendant, after all, should not escape the requirement to pay prejudgment interest to a plaintiff for damages that are "certain" or "capable of being made certain by calculation" (Civ. Code, § 3287, subd. (a)), simply because the defendant also caused the plaintiff to suffer other damages of an uncertain sum.

E. *The Court's Alleged Bias*

Keith and Kraig contend we should reverse because, in their view, "the superior court [wa]s prejudiced and biased and plaintiffs obtained an unfair advantage." They reason: "[T]he Plaintiff George Rumiano conflictually and purposefully sued himself, by suing his own partnership interest and the partnership itself, creating a prejudice and bias for the superior court against the defendants and giving the plaintiffs an unfair advantage in this case."

But because Keith and Kraig offer no legal authority or reasoned argument supporting this claim, we treat the point as forfeited. (*Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784-785 ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].) To the extent, moreover, that Keith and Kraig allege that a partner cannot sue his or her own partnership, they are wrong. The Corporations Code expressly recognizes that "[a] partner may maintain an action against the partnership" to, among other things, "[e]nforce the partner's rights under the partnership agreement." (Corp. Code, § 16405, subd. (b)(1).)

F. *Keith's and Kraig's Right to Counsel in the Contempt Proceedings*

Keith and Kraig's next argument concerns the court's ruling finding them in contempt of court. The court, again, found both (along with Gary) in contempt of court in 2011 because they failed to produce documents after being ordered to do so. The court then placed the brothers "on summary probation on the condition that [they] compl[y] with the order of the Court" and, after they still refused to produce records, the court sentenced them to five days in jail. Because, Keith and Kraig argue, the court did so "without affording [them] the situation where [they] could have counsel capable of representing their full rights," "[t]he Judgment in this case"—meaning the "Judgment dated March 13, 2018"—"must be automatically reversed."

We reject their argument. Even supposing that the court improperly found them in contempt of court in 2011, that would not be ground in itself for reversing the court's judgment in 2018—which had nothing to do with, and was not impacted by, the earlier contempt proceedings. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573 ["a judgment [may] not be reversed unless error caused actual prejudice in light of the whole record"].)

38

G. *The Court's Rejection of Keith & Kraig's Disqualification Efforts*

Keith and Kraig next argue that one judge wrongly entertained Karen's suit after being handed a statement of disqualification under Code of Civil Procedure section 170.3. We disagree.

Keith and Kraig, again, sought to disqualify at least six judges in the course of the case. They attempted to do so under Code of Civil Procedure section 170.3, subdivision (c)(1), which, relevant here, states: "If a judge who should disqualify himself or herself refuses or fails to do so, any party may file with the clerk a written verified statement objecting to the hearing or trial before the judge and setting forth the facts constituting the grounds for disqualification of the judge." Although the brothers' statements of disqualification are not part of the record, Keith and Kraig appeared to have argued that no judge could hear the case because George "had unfairly sued his defendant partnership and partnership interest."

Most of the judges, however, rejected the brothers' efforts, including, relevant here, Judge Scheuler. Judge Scheuler found that the brothers' statement of disqualification against him disclosed no legal ground for disqualification and so, relying on Code of Civil Procedure section 170.4, he "ordered the disqualification struck." (Code Civ. Proc., § 170.4, subd. (b) ["if a statement of disqualification is untimely filed or if on its face it discloses no legal grounds for disqualification, the trial judge against whom it was filed may order it stricken"].)

According to Keith and Kraig, however, the judge's ruling was procedurally infirm. Citing Code of Civil Procedure section 170.3, subdivision (c)(3), they argue that Judge Scheuler needed to file a written answer to their statement of disqualification before striking the statement. (Code Civ. Proc., § 170.3, subd. (c)(3) ["Within 10 days after the filing or service, whichever is later, the judge may file a consent to disqualification . . . or the judge may file a written verified answer].)

They are wrong.  A judge, to be sure, can file a written verified answer in response to a statement of disqualification.  But a judge can also, as an alternative option, strike a facially defective statement under Code of Civil Procedure section 170.4, subdivision (b). (See *PBA, LLC v. KPOD, Ltd.* (2003) 112 Cal.App.4th 965, 972.)  Keith and Kraig have not shown that the court erred in taking the latter approach.  Nor have they even shown that they timely and appropriately challenged the court's order.  Because we find nothing in the record showing the brothers challenged the court's order "within 10 days after service of written notice of entry of the court's order determining the question of disqualification," as the law requires, we find they forfeited their argument in any event. (See Code Civ. Proc., § 170.3, subd. (d) ["The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding.  The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification."].)

H.  *Code of Civil Procedure Section 583.310*

Keith and Kraig next claim that this case must be dismissed because it was not, as required under Code of Civil Procedure section 583.310, "brought to trial within five years after the action [wa]s commenced." (Code Civ. Proc., § 583.310.)  But no one, it appears, ever raised this alleged issue at the trial level.  (See *id.*, § 583.360, subd. (a) ["An action shall be dismissed by the court on its own motion or on motion of the defendant, after notice to the parties, if the action is not brought to trial within the time prescribed in this article."].)  For that reason, to the extent Keith and Kraig had a valid claim under this statute, they forfeited it.  (*Southern Pac. Co. v. Seaboard Mills* (1962) 207 Cal.App.2d 97, 104 ["a defendant waives objection to antecedent delay by going to trial without moving to dismiss"].)

I.  *Keith & Kraig's Estoppel & Forfeiture Claims*

In their reply brief, Keith and Kraig claim that Karen is estopped from pursuing her appeal because she "voluntarily had an acquiescence in a judgment, by levying funds to satisfy a judgment and relinquishing her foothold on the Willows properties to defendant Rumiano Farms."  They also suggest that Karen forfeited her appeal because she filed her appellate brief late.  Neither claim has merit.

First, on the estoppel claim, Keith and Kraig have cited nothing showing that Karen voluntarily "relinquish[ed] her foothold on the Willows properties to defendant Rumiano Farms."  And although we accept that Karen levied funds to satisfy the monetary aspects of the judgment, she is not, for that reason, estopped from challenging other aspects of the trial court's decision.  As our Supreme Court has explained, "a party may take the benefits of the determination of one issue and appeal from another severable part of the judgment." (*Templeton Feed & Grain v. Ralston Purina Co.* (1968) 69 Cal.2d 461, 468.)

Second, on the forfeiture claim, Karen did not forfeit her appeal simply by filing her brief a little late.  An appellate court, it is true, may dismiss an appeal if the reviewing court clerk notifies the appealing party that her brief is tardy and that, unless her brief is filed in the next 15 days, the appeal may be dismissed.  (Cal. Rules of Court, rule 8.220(a).)  But this court never sought to dismiss Karen's appeal under this rule.

III

*Karen's Remaining Contentions*

A. *Karen's Partition Action*

Finally, we turn to Karen's remaining contentions.  She first argues that the trial court wrongly granted Gary's motion for summary adjudication on her partition cause of action.  We agree.

In his motion for summary adjudication, Gary argued that Karen could not dissolve the partnership and partition its property for several reasons.  He first asserted

41

that Karen could not seek a dissolution of the partnership under the Corporations Code, because she was a nonpartner transferee with only an economic interest in the partnership. Although he acknowledged that transferees may seek a dissolution "if the partnership was for a definite term or particular undertaking" (Corp. Code, § 16801, subd. (6)), he argued that the partnership here involved neither a "defined term" nor a "particular undertaking." Gary also, relevant here, argued that the partnership agreement expressly restricted the terms of dissolution, providing that the partnership may be dissolved only "upon agreement of the partners." The court afterward accepted both of these arguments. It found that Karen, as a transferee, could not seek a dissolution under Corporations Code section 16801, subdivision (6), because "the partnership had no definite term and no particular undertaking." And it found that "the partnership agreement provides for dissolution of the partnership only by agreement of the partners."

Both conclusions, however, were improper. First, as Karen argues, part of the trial court's ruling (and Gary's motion) followed from a mistaken premise—namely, that the trust acquired only George's economic interest and not his full partnership interest. Because as discussed in part I.B. of the Discussion above, the court should have found that the trust acquired George's full partnership interest, it also should have found that Karen, as trustee of the trust, had far broader authority to move for dissolution. Relevant here, as provided in Corporations Code section 16801, subdivision (5), a partnership may be dissolved if, on application by a partner, a court "determin[es] that any of the following apply: [¶] (A) The economic purpose of the partnership is likely to be unreasonably frustrated. [¶] (B) Another partner has engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the business in partnership with that partner. [¶] (C) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement."

Second, the court improperly concluded that the partnership may be terminated "only by agreement of the partners." Unlike Karen, we accept that the agreement could

42

be interpreted in this manner. In paragraph IV, the partnership agreement provides: "The partnership having heretofore commenced shall continue until terminated hereunder" (i.e., "until terminated" in accordance with the partnership agreement). (Black's Law Dict. (11th ed. 2019) [defining "hereunder" to mean "[l]ater in this document" or "[i]n accordance with this document].) In paragraph XXV, the agreement then provides the process for terminating the partnership: "Upon agreement of the partners, the partnership may be dissolved and the assets liquidated . . . ." These two paragraphs together arguably show that the partnership "shall continue" until the partners all agree to terminate it.

But even accepting that reading, Karen would still not be barred from seeking a dissolution under Corporations Code section 16801, subdivision (5). Earlier we mentioned that the statutes of the Uniform Partnership Act apply only "[t]o the extent the partnership agreement does not otherwise provide." (Corp. Code, § 16103, subd. (a).) But there are several important exceptions to that general rule. Relevant here, a "partnership agreement may not" "[v]ary the requirement to wind up the partnership business in cases specified in paragraph (4), (5), or (6) of Section 16801." (*Id.*, § 16103, subd. (b)(8).) And so even if the partnership agreement here purported to allow dissolution only if all the partners agreed, a partner could still seek dissolution under Corporations Code section 16801, subdivision (5).

Although Gary counters that Karen forfeited her argument by failing to procure an adequate record on appeal, we find differently. He argues, in particular, that Karen forfeited her argument because she failed to provide "Gary's separate statement, his evidence, his Reply memorandum of points and authorities, or his objections to evidence." But Gary has not explained why these materials are necessary to resolve the issues presented, which, considering the parties' arguments on appeal, appear to require consideration of only the partnership agreement (which is part of the record) and the Corporations Code. (See *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 112, fn. 8 [finding the record on a summary judgment motion

43

"adequate for analysis of the issues presented," even though it was incomplete].)  In any event, Karen appears to have supplied all the allegedly missing documents at the time of her reply brief.  (See Cal. Rules of Court, rule 8.124(b)(6) ["An appellant's reply appendix may contain any document that could have been included in the respondent's appendix."].)

B. *The Willows Properties*

Karen next asks us to reverse the trial court's ruling that the Willows properties were partnership assets.  Her argument is twofold.  She first argues that the court's ruling must be reversed because the court failed to apply the presumption in Evidence Code section 662, which states:  "The owner of the legal title to property is presumed to be the owner of the full beneficial title.  This presumption may be rebutted only by clear and convincing proof."  She next suggests that, even if the court applied this presumption, it wrongly found that the evidence in the record overcame this presumption.  We find neither argument persuasive.

We start with Karen's argument concerning the presumption in Evidence Code section 662.  Karen claims "the Superior Court overlooked the presumption mandated by section 662 of the California Evidence Code."  But, at most, she has only shown that the court never explicitly discussed Evidence Code section 662 in its ruling.  Her argument, thus, is effectively this:  We must presume that "the Superior Court overlooked the presumption mandated by section 662," because the court never expressly discussed the statute.

But that approach turns the appellate review process on its head.  We do not, as Karen believes, presume the court got it wrong unless proven otherwise.  We instead presume the court's judgment is correct.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."].)  As one court has said under similar circumstances, "[i]n light of the . . . court's failure to

44

articulate an incorrect standard, [appellant's] failure to request clarification of the record below, and the presumption the . . . court applied the correct statutory standard of proof, this issue fails for want of a record which affirmatively demonstrates error." (*Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1025; see also *In re Angelia P.* (1981) 28 Cal.3d 908, 927 [finding a trial court appropriately terminated the parties' parental rights under the clear and convincing evidence standard, even though the court "did not expressly articulate its use of the appropriate standard of proof"]; *Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 561 ["Absent any evidence to the contrary, we presume that the trial court applied the correct legal standard."].)

We turn next to Karen's claim that the evidence was insufficient to overcome the presumption in Evidence Code section 662. In Karen's telling, "the evidence in the record strongly bolsters" the presumption in Evidence Code section 662 that George and Kathleen owned the Willows properties. We find differently.

George and Kathleen, it is true, were listed as the title owners of the Willows properties. The prior owners transferred these properties, along with the Vina ranch and other assets, to George and Kathleen in exchange for $2,273,057 in 1979. But neither George nor Kathleen, it appears, ever paid a dollar of their own funds for the Willows properties. They instead appeared to finance the purchase through two loans, with no cash down, and the partnership then paid down the loans and paid the property taxes.

The escrow instructions for the purchase, for example, showed that George and Kathleen purchased the Willows properties (and other assets) for $2,273,057 in 1979, and all parties agree that George and Kathleen "borrow[ed] the cash amount in two loans." Gary, moreover, testified that the "partnership paid off the loans that bought the Willows propert[ies]" and supplied records showing that the partnership paid the property taxes for these properties. Largely consistent with Gary's testimony, Kathleen testified that the partnership "paid the expenses and taxes on the" Willows properties and, at least "at first," paid for the two loans.

45

Although Karen attempts to counter this evidence, we find her efforts are unpersuasive. She alleges that George and Kathleen purchased the Willows properties and other properties in 1979 "using money from Kathleen's family," but she cites nothing in the record supporting her claim and, a paragraph later, she acknowledges that the cash used to purchase the Willows properties and other assets came from two loans. She also alleges that the "expenses of Vina Ranch, the Willows Ranch, and the Willows Office, including loan payments, were paid [in part] . . . with . . . cash or loans from George and Kathleen." In support, she cites Kathleen's trial testimony that she and George paid off one of the loans involved in the 1979 purchase using their own funds. But Gary countered this testimony, stating that the partnership itself paid off the referenced loan after selling one of its assets (namely, the milk "quota" for its dairy cows). And the trial court, after weighing the parties' competing testimony, ultimately found Gary's testimony more credible. Karen may disagree with the court's determination that Kathleen presented "[n]o credible or documented evidence" to show that she and George "made any payments towards these properties independent of the partnership," but it is not our role to reevaluate the trial court's credibility determinations. (See *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1076 ["an appellate court [may not] substitute its determination of [a witness's] credibility for that of the trial court"].)

Considering this record, we find that the evidence sufficiently shows that the partnership, not George and Kathleen, paid the property taxes and the loans for the Willows properties. And these facts triggered an important presumption unmentioned by Karen: "Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership." (Corp. Code, § 16204, subd. (c).)

46

The partnership, moreover, did more than pay for the Willows properties; it also carried the properties on its books. According to the partnership's accountant, for example, the partners had long represented that the Willows properties were partnership assets. She explained that, when she started as the partnership's accountant, the partners supplied her with notes showing the Willows properties to be partnership assets, and, even before she became the partnership's accountant, the partners placed the properties on the partnership's depreciation schedules and attributed the properties' income and expenses to the partnership. Considering these facts, she stated: "[O]n the partnership books it is always shown that it has been a partnership asset," and "[a]s far as the IRS is concerned, the Willows property is in the partnership."

On these facts, and "view[ing] the record in the light most favorable to the prevailing party," we have no trouble concluding that "the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that" the Willows properties were partnership assets. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 [discussing appellate review of findings made under the clear and convincing evidence standard].) To use, with slight modification, the words of our Supreme Court involving a similar case with property titled "in the name of the individual partners," "the [largely] uncontradicted evidence showed that the property was purchased with partnership, funds, that it constituted the place of business of the partnership, and that in every way it was treated as partnership property by the record owners. The trial court's finding that the property was an asset of the partnership was, therefore, amply supported." (*Bumb v. Bennett* (1958) 51 Cal.2d 294, 301.)

Karen counters that several considerations should favor a contrary ruling, including that George never transferred the Willows properties to the partnership, the partnership agreement does not list the Willows properties as partnership assets, and the partnership "never listed the Willows Properties as assets on its tax returns after 2007." But again, that George and Kathleen retained title to the Willows properties in their own

names is not controlling. Nor do we find it particularly meaningful that the partnership agreement does not discuss the Willows properties. (See Corp. Code, § 16204, subd. (c).) And although Karen claims the partnership "never listed the Willows Properties as assets on its tax returns after 2007," she cites in support only a part of the referees' ruling stating that the "Willows properties were deeded to George and Kathleen and remained in their names"—something, again, we decline to find controlling.

Karen further contends we should presume that the Willows properties "were carried on the books merely for convenience" and presume that the partnership was George's lessee and paid the Willows properties' mortgage, taxes, and expenses as part of the lease terms. But in reviewing the trial court's ruling, we do not construe the facts in the light most favorable to the losing party (here, Karen); we instead "view the record in the light most favorable to the prevailing party." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011-1012.)

Karen also argues that "even the referees found that" the record was insufficient to support the brothers' claim that certain " 'challenged payments were personal to George.' " But Karen never clearly explains the relevance of this detail. The referees, it is true, rejected the brothers' contention that "George used partnership assets for personal use" in certain instances. But the referees never resolved whether the partnership or George and Kathleen paid for the Willows properties—an issue that the trial court itself resolved in the partnership's favor well before the referees were even appointed. To the extent the referees discussed the Willows properties, moreover, they appeared to side in the brothers' favor, stating: "The partnership paid for all of the expenses on all of the assets i.e. both Vina and Willows, and the partnership paid for the debt service on all of the assets purchased through the loans."

Finally, Karen argues that the brothers' own complaint shows that they thought "the Willows Properties were not actually assets of the Partnership." In support, she cites a portion of the complaint alleging that George "used partnership funds to pay [his]

48

personal and business expenses not a part of or associated with the partnership," "including insurance, taxes and operating expenses associated with a commercial office building and a ranch located in the City of Willows, Glenn County." According to Karen, this amounts to a "judicial admission" that the Willows properties were not partnership assets. But the brothers also, later in that same complaint, alleged that because the partnership had paid for these properties, "the partnership holds an unspecified interest in said properties in an amount equal to the amount of said contribution of partnership funds." Considering the allegations in the complaint as a whole, we decline to find that the complaint includes the judicial admission that Karen asserts.

## DISPOSITION

The judgment is reversed in part and affirmed in part, and the matter is remanded for further proceedings. Karen is entitled to recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


\s\
BLEASE, Acting P. J.


We concur:


\s\
ROBIE, J.


\s\
KRAUSE, J.


49